Good morning, ladies and gentlemen. Our first case for argument this morning is United States on the relation of Heath against Wisconsin Bell. Mr. Chisler. Good morning, Your Honors, and may it please the Court, David Chisler on behalf of the Plaintiff Appellant, Todd Heath. If there is just one point that I could impress upon you this morning, it is the following. This case and this appeal do not turn on any kind of semantic gamesmanship over the words similarly situated. And let me explain what I mean by that. We know for certain that Wisconsin Bell charged significantly higher prices to many school districts and libraries. In fact, often the most financially needy school districts and libraries, they charged them higher prices than they charged other customers for the same services at the same time. Now, even if you assume that Plaintiff, that we had the burden to prove that those price differentials were not justified by the costs that Wisconsin Bell incurred to provide those services, in other words, even if we had the burden. You do have the burden of showing similarly situated, right? Right. So we had the burden to show. What I'm saying is, let's assume for a minute that we did have the burden to show similarly situated. I'm telling you, you do. Yes. The attempt to, your brief spends a lot of time trying to shift the burden of proof to the defense. That's not persuasive. You may very well have enough evidence to go forward. That's what I'd like you to focus on. Right. So, very well then. We, in terms of proving that the costs that Wisconsin Bell incurred do not justify the price differentials, we did that in two distinct ways. And either of which is sufficient to get past summary judgment. The first was through our expert, Jim Weber. Mr. Weber examined a massive amount of data in this case. He examined billing records and related information from more than 1,000 Wisconsin Bell customer contracts. And when he examined that information, of course he looked at the services that would be provided, the prices that would be charged, and the time periods. But he went well beyond that. He actually looked at cost factors in every one of those contracts. He looked at cost factors, cost indicators to determine what the costs would be of providing services to those particular customers. So, for example, he looked at the length of the contract term. He looked at the size of the customer in terms of the number of employees to approximate call by. He looked at whether the customer was in an urban area or a rural area. He looked at the loop length, the distance between the customer and the switching station. Those are the cost factors that the FCC called out as being possibly indicative of or justifying a different price for a E-rate customer. And so when he compared prices that were charged to E-rate customers to lower prices that were charged to schools and libraries, he was looking at the cost factors for each of those customers. And his analysis, his conclusions on that are contained in Table 13 of his expert report. And he was able to conclude that those cost factors did not justify the higher prices that were charged to schools and libraries. Now, this was not an easy task. You will recall, based on the proof that we presented, that Wisconsin Bell did not have an LCP process. So it's not as if Mr. Weber could go in and audit their LCP process to see... And by LCP, you mean? The lowest corresponding price. Thank you. The process for determining the lowest corresponding price. I apologize. So he had to create that process from scratch. And his report is 120 pages long, going through all of the different steps he took to equalize services, the prices, the cost factors. In fact, this is just one exhibit. There's 26 exhibits to the report. This is just one going through. You can see all the spreadsheets aligned for every single contract, specific notes that he took on every single contract to make sure there was no idiosyncrasies and to make sure he was comparing apples to apples. So that is certainly one way and a robust way in which we have proven that the higher prices charged to school districts were not justified by any kind of cost differential. The second way we proved that, putting aside the expert report, is the proof that we put forward about what Wisconsin Bell did and did not do with respect to their LCP, the lowest corresponding price requirement. If you would use real words, that would help people. We're not born and bred on your initialists. I apologize. You all have been living with this case for what, 15 years plus at this point? It's a long time. We have not. And by the way, whenever your brief says WB, all I could read was Warner Brothers. You really don't want to do that. So I've tried to say Wisconsin Bell and I will try to say lowest corresponding price. So what we proved is that Wisconsin Bell never calculated a single lowest corresponding price. For years and years, during the time when they were obligated to provide the lowest corresponding price to their E-rate customers, they never even bothered to calculate a single lowest corresponding price. And they didn't put into place any process by which they could have calculated that lowest corresponding price. And in fact, the process that they did have in place, and this process is described and cited to on pages 12 through 16 of our opening brief, the process that they did have in place was antithetical to the requirement of lowest corresponding price. Because what they did was they were instructing their salespeople to try and get the maximum price possible for any customer, whether it was an E-rate customer or a regular customer. In fact, there is specific evidence where salespeople are being instructed, don't floor dive, which means don't try to get to the lowest corresponding price, try and maximize the prices. And their process did not include looking at their cost structure and trying to tailor their pricing to their cost structure. So given what they didn't do and what they did do, there is no way for a jury to conclude that their prices somehow magically aligned with their costs because they didn't bother to go through that analysis. And so there how then was summary judgment awarded to Wisconsin Bell? The award really comes down, the decision comes down to really can be summarized in one sentence from the court's decision, and I want to read that sentence. The court concluded, quote, Heath makes no argument that any of Wisconsin Bell's customers were similarly situated based on any factors related to cost. And what I've just demonstrated is that statement is just simply wrong. We did demonstrate that in the two ways that I described. Now, I know, I understand that Your Honor says, I understand that we have the obligation to prove that the customers were not similarly situated. No, but were. But there is a, excuse me? Your burden is to prove that they were. At least some examples and Weber's methods in essence are sufficient to get to a jury. Right. Although the FCC did say in their guidance, we will only permit providers to offer schools and libraries prices above the prices charged to other similarly situated customers when those anything it wants, but it doesn't change the burdens of proof and persuasion in court, right? You come to court, you have to meet the court's structure of burdens, no matter what the burdens were before the agency. Understood, Your Honor, but can I explain? You don't want to be making this argument. You're wasting your time. Well, I don't want to waste my time, Your Honor, but given that Wisconsin Bell was requesting reimbursement from the E-rate program, they had an obligation to provide the lowest corresponding price or demonstrate. That's the substantive requirement, not the procedural requirement when you come to court. Right. But when you come to court, it's actually an even stronger requirement because this is a False Claims Act case. So you have to show fraud. Well, not specific intent to defraud, but we do need to show false claims. Specific intent can be pleaded generally under the rules, but all the elements of fraud have to be pleaded with particularity. You just don't want to try to get out of what the burdens are. As Judge Hamilton said, accept your burdens and argue that you've met them. Well, I think we have. I have argued that. And counsel, along those lines, going back to Mr. Weber's report, the way I read his report is that he considered those cost-based factors in response to a hypothetical rebuttal by Wisconsin Bell that charging the lowest corresponding price would not be compensatory. In other words, he considered the cost factors not in determining whether or not two customers were similarly situated, but the only criteria he looked at, as I could tell, to determine whether two parties similarly situated was geographic area. He then says, well, okay, these parties are similarly situated, and in the event Wisconsin Bell argues that the lowest corresponding price as to those customers was not compensatory, it may rely upon these cost factors, and this is how I would respond to that hypothetical argument. It doesn't seem to me on the face of his report that he is opining that alternatively, if in determining whether two parties are similarly situated, one provider has to consider cost factors, then this is how that analysis would proceed. And so I'm curious as to your argument that Mr. Weber's report provides the evidentiary basis for that second argument. Well, what Mr. Weber's analysis does is he looks at situations where E-rate customers, where schools and libraries are actually being charged higher prices for the same services at the same time. That is antithetical to providing the lowest corresponding price unless there is some excuse that would justify a cost-based excuse to justify that price differential. And so what Mr. Weber did was he looked at the cost indicators for the customer that is getting charged the higher price, and he looked at the cost indicators for the customer that is being charged the lower price to see whether there could be a justification for the price differential. And what he concluded was that in most cases there was not. Would you agree, counsel, though, that your affirmative case is just the first half of that process? That is, Weber identifies similarly situated customers, higher prices being charged to schools and libraries. And that's your evidence, right? Now, as a practical plaintiff, you've got to anticipate there would be a defense, and Weber went on to do those other things and anticipate, as Judge Lee suggested, this hypothetical rebuttal. I don't know that we've seen any rebuttal along those lines from the defense, but it's the identification of, in essence, those pairs or more of customers that is your burden. Correct. Okay. And then I will just say, as somebody, people in this court see a lot of FCA cases involving health care, allegations of fraud and billing and so on, and what we are usually begging for is examples, and often at the pleading stage rather than summary judgment. In your briefs and in the Weber reports and affidavit, there are a number of examples identified. I take it those are not all. That's correct. By a long shot. Not by a long shot. Okay. Can you help us understand Judge Edelman's footnote one, saying you all didn't develop these arguments? It looked to me like there were quite a few examples in the district court briefs. Not only in the briefs, but, I mean, there's the exhibits to the report. Well, it's fair to expect, in essence, a guided tour for a district judge who's got a few hundred other cases to worry about. I can't explain why he said what he said, other than the truth is the arguments below didn't even really focus. When Wisconsin Bell was moving for summary judgment, they didn't really focus on this whole cost issue, and, in fact, they, to this day, have never tried to justify the price differentials based on cost. They've done nothing whatsoever to do that. So we actually tried to be sensitive to district court judges and not overload them with massive amounts of material on every possible issue that could be raised. We addressed the major issues. Of course, we explained to the court that we did consider the cost factors, both in the expert report and simply by proving that what Wisconsin Bell did and didn't do couldn't have possibly justified the cost differentials. They couldn't possibly have— When you say couldn't possibly, did your expert make a statistical analysis of how likely that was? No. Isn't that a surprise? It was a surprise to me. Normally, when you analyze statistics, you produce statistics showing the degree of confidence that something is true, right? And you would expect an estimate of the degree of confidence that cost differences did not justify the price differences. There doesn't appear to have been any effort to do that. I wonder why. Well, first of all, Mr. Weber did go through—I mean, he didn't even do a random sample. He went through more than 1,000 contracts and the materials for more than 1,000 contracts. Certainly, the more data points there are, the higher the confidence will be when you do, say, a t-test. But that apparently was never done. I guess just from a matter of common sense, if you are— I don't think common sense and statistics have very much in common. Indeed, the whole reason why there is a discipline called statistics is that common sense doesn't work very well for large numbers. Fair enough, Your Honor. But the only point I was trying to make is that you don't always need a statistical analysis. There has to be some sort of predicate for the analysis to take place. In this particular situation, there is no predicate. Well, you say you don't always need a statistical analysis. Are you acquainted with Castaneda against Partita? Statistics are used very commonly in Title VII discrimination cases. And the Supreme Court in Castaneda said that a statistical analysis is essential, that you have to show that there's at least an 80 percent probability that the results could not have been achieved by chance. Now, statisticians have disagreed about whether the Supreme Court was wise in Castaneda, but there it is. And here we have a case where there's not even an effort to do this. Well, we provided a massive amount of data. I thought your burden was simply to show price differentials between similarly situated customers, period. That's correct. And the question is whether, and what Wisconsin Bell is arguing is similarly situated also implies similarly situated with respect to cost. Well, I think we could get there, but we'll see what they have to say about that. But, you know, it may be that statistical analysis becomes relevant at the stage of CENTER. But I understand you're arguing to be Wisconsin Bell wasn't doing anything for a while, at least for a while. Correct. There is no statistics to be had on that issue. You may want to save your time for rebuttal. But before you do that, I have a question about the status of litigation in D.C. What's going on there? I find it odd that there's a nationwide suit in D.C. for everybody except Wisconsin. Only because the Wisconsin litigation was first and had progressed further along and because the issues, because AT&T essentially controls the pricing policies and all the Wisconsin Bell and a lot of other subsidiaries, it made sense to just proceed with this case. What's the status of the D.C. case? It has stayed and no discovery has happened in that case. Why has it stayed? I think the thought was that based on the outcome of this case, it could very well resolve or lead to a settlement in the other case. OK. Thank you. And I will give you a minute for rebuttal since I used your last minute. Ms. Walker. Good morning, Your Honors. Helgi Walker for Appley Wisconsin Bell. I want to just quickly tick through some points that I think are responsive to my friend on the other side's presentation and your questions. First, the court seems to agree that Mr. Heath has the burden to show similarly situated. But I want to make clear that his idea of similarly situated, not only in his briefs below, in this court and in the Weber report, is completely wrong under the FCC's rules and the FCC's guidance. The FCC made clear in the first report in order at paragraphs 48 through 49 and in the fourth report in order at 141 that costs are relevant to the provider's initial determination as to whether two customers are similarly situated. That's what similarly situated means. Of course they are relevant to the provider. Excuse me? As Judge Hamilton said right at the outset, we're trying to figure out what the rules are in litigation. Absolutely. One way, I'm glad you agree with me. One way to put the question is, can a plaintiff ever get a prima facie case through statistical evidence? Now the answer in, I've already mentioned the law of employment discrimination, that answer is yes. The answer in wages and hours litigation is yes. There are many fields where it's common to establish the claim statistically and then look, the law of large numbers does the rest of my job. Why would this field be different? Because Mr. Weber's report doesn't even use the right standard. No, you're not answering my question. You're saying, your brief pretty much says, forget about statistics. They have to show provider, one customer at a time, what services were, what costs were, and so on. I'm asking whether, as a legal matter, a plaintiff can get a prima facie case statistically. We'll get that resolved and then you can attack the statistics used in this case. The statistics would have to at least make the relevant analysis, the comparison here under the plain terms of the FCC's rule, 47CFR.540, is whether a particular, that's the language of the regulation, a particular school or library is similarly situated. Now we can imagine statistics about, why? Because that's what the regulation says, Your Honor. Look, we are in court. Think about Title VII litigation. The rule in an individual Title VII case is that you have to show you were discriminated against compared with X, a given comparator. But when statistics are used, you could show, for example, that whites are promoted at a rate of 60% and blacks at a rate of 40%. And if that turns out to be statistically significant, the plaintiff has made the case without pointing to an individual comparator. The question I'm asking is why that doesn't apply equally to this kind of litigation. I have never seen pure statistical analysis being used to show a violation of the lowest corresponding price rule. That is what Mr. Heath has alleged. That may well be true because so far as I can tell, there's very little litigation about that subject. The reason I'm asking this question is that the federal courts use statistical means of proof all the time. And you're arguing, for reasons I must confess I don't really follow, that that absolutely cannot be done in this corner of the law. Well, we're not saying that, Judge Easterbrook. If I could turn to this case and this report, what we're saying is this— Let's figure out what the legal standard is, if I might. And then we turn to this report. The legal rule in this circuit is that any plaintiff bringing a false claims act bears the burden of proof. You said that in a moment, Meadows. Regulatory whatever doesn't change that burden of proof. So does this circuit have legal rules about when it's appropriate to use statistics to prove a case? Not that I am aware of. But Mr. Heath has alleged— If—I don't need to focus on the statistics. I just want to talk for a minute about what is— I know what you want to talk about, but I would appreciate it if you would talk about what I want you to talk about. I'm not sure what the answer to your question is about statistics, Judge Easterbrook. All right. So, counsel, the similarly situated standard is obviously pretty loose. But it does have at least some content. Absolutely. So we have a number of examples, one-to-one comparisons or one-to-two-or-three comparisons from the relator's submissions identifying what, at least from 20,000 feet, look like similarly situated customers, same products and services, same contract length, entered at the same time with pretty wildly disparate prices. What's wrong with those comparisons? Why are they not sufficient to at least get past summary judgment? A couple of reasons, and thank you for asking. Those facts don't show that any particular school or library is similarly situated based on cost factors at the very least, at the very least—and this was low-hanging fruit for the relator—based on the four cost factors that— Yeah, you see the problem. You're answering Judge Hamilton by saying statistics must be ignored. No, Your Honor, I'm— They don't show for any given person. No, with respect, Your Honor, I'm pointing out that the substantive factors that Mr. Heath used are not the substantive cost factors that the FCC said 25 years ago are relevant to whether a customer is similarly situated. That's call volume, contract length, distance from a switching facility, and participation in a consortium. He looked only at contract length, and he only looked at distance from a switching facility for one service only, Centrex. So what we know about these customers is very little, and what we do know shows that they're not similarly situated. Where do we see that evidence that they are not similarly situated? Well, we see it on the face of some of his charts. He has a chart for 2006 integrated services digital networks. I'm trying not to use an acronym, services. And on the face of it, you can see that the Bruce Guadalupe Community School District is not similarly situated to, for instance, automated data, a commercial customer in the state, because the school has a month-to-month contract, and automated data has a three-year contract. There are plenty of comparisons. It's frustrating the way some of this material was presented, but there are what look like some apples-to-apples comparisons with contract length and the other factors that Weber identified. But he didn't use any of the obvious factors that people in this world have known about for 25 years. And he didn't even, and this is really important, Mr. Heath never set out to show that any particular customer was similarly situated under the correct understanding. Mr. Heath thinks- Why does he have to? Because he is- You're just assuming- Because he's the plaintiff- A negative answer to my question. Because he's the plaintiff in a false claims act. Trying to talk over a judge's question also doesn't help your case. Why does he have to show that individual customers are similarly situated to somebody else? Going back to Title VII cases, if that were true, there could never be statistical proof in Title VII cases. You would always have to make a person-to-person comparison, and the Supreme Court has held that that's not necessary. I still don't see your answer to my question why what's true in Title VII cases is not true in this style of case. Because the substantive violation that has been alleged here requires that- That's what it requires in Title VII cases too. That's your problem. That's not my understanding of Title VII litigation, but I don't- I'm obviously going nowhere. Counsel, if your critique is that Mr. Weber's analysis does not consider the relevant cost factors, what is your response then to plaintiff's reliance upon Table 13, where he seems to different customers? Table 13 is just a table with a lot of dollar figures in it. It doesn't tell us, and Weber's entire report from start to finish never says Customer X is similarly situated to Customer Y. No, he doesn't, but to the extent that your argument is that in order to do a proper analysis to determine whether or not there's any pricing differentials between customers, Weber had to consider various factors that the FCC identified, such as volume, distance from the switch, contract length and terms. And in Table 13, it's just a summary of his analysis, obviously, he seems to at least control for those factors. And he says even when I control for those factors, there's still this price differential. So with all respect, that's not by his own terms what he's trying to do. In this section of the report, he's just tallying up damages, which is adding up all the quote-unquote overcharges that he found, which are just differentials in price. But doesn't he do that after controlling for those four things? I'm looking at Table 13 right now. No, Your Honor, he says, he starts off this section at page 76, what Mr. Heath repeatedly cites to say, when Wisconsin Bell offers and sells its services, it must offer them the benefit of any non-residential customer in the whole state. Again, that's the wrong analysis, that's the wrong standard, the wrong analysis. Why does that matter? Because the chart just assumes a violation. But if I could go on with the chart, Your Honor, because this is really important. But let's, I know what he says. But in substance, though, he basically says, look, you know, if in order to figure out whether people are similarly situated, assuming that I have to consider these factors, I've controlled for them and did this kind of differential analysis, so to speak, here. And even after that, statistically, I get these differentials. So again, this is just a chart with numbers. He's just adding up the overages. He actually never says, I'm trying to identify similarly situated customers. And we can't tell, we can't tell from this chart which schools he's even talking about. And if you go back to Exhibit S, which supposedly contains the underlying data, you can't even reverse engineer what schools he's talking about. And the district court shouldn't have been, nor should this court, be required to kind of try to figure out who he's talking about with respect to this chart. Wasn't that all, and that's something that the parties raised and discussed in the Daubert motions, right? That the district court decided not to rule. Well, I mean with respect to whether Mr. Heath had shown necessary evidence on similarly situated customers to get past summary judgment. The district court said he never argued that. And the district court was absolutely right, he never argued that. Because his primary theory was that the lack of an adequate compliance system necessarily resulted in overcharges. Mr. Chisler raised that point this morning. I want to dispense of that under this court's decision in Cruz at 856, where this court said it is not a valid False Claims Act theory to say that defendant's practices necessarily resulted in a false claim. And that was his primary theory below. At page 76 of this analysis, this is really important. Mr. Weber himself said, quote, I do not advocate using any of these potential factors or filters in this case, because he didn't even have confidence in them. And that's because this is not what his report was even about. And the district court was, frankly, generous. This goes to some of Judge Hamilton's questions about a district court getting a guided tour. He didn't even get a drive-by flash of this theory. All Mr. Heath said in his opposition to summary judgment was two sentences in a 60-page brief. This is at pages 36 through 37 of his opposition that just said Weber considered costs. But he never said what the factors were. And most importantly, he never tried to say which school was similarly situated to whom. What about page 14 of that brief? That's the facts section of his brief. Well, he's got a table there that lays out different customers where it looks like apples to apples comparisons are possible. What more is needed? Well, you're supposed to include it in your argument to the district court, not just throw a bunch of facts against the wall and hope they stick or the district court figures it out. Would you answer my question, please? Why doesn't that? What more is needed? And what more does a plaintiff have to show to establish similarly situated customers were being offered the same services for much less? I think that if we all got together, we could do a much better job on this than Mr. Heath did, and that would be. What would a plaintiff have to show? A plaintiff would have to start at a bare minimum with the four cost factors that the has been around for 25 years. You would at least look at those factors. He did not. He said he would have looked at call volume, and this is in the report, but Wisconsin Bell didn't produce the data. Under your decision in moments at 714, that's not an adequate answer either because defendants' recordkeeping practices do not relieve the plaintiff of the burden of proof. At the very least, Your Honor, they could have looked at the four factors or tried. Three of them he didn't even try or just ignored. You would say, here's the proper legal standard. Here's the rule, and our analysis flows from there. He never even did that, Your Honor. I think it's generous. If we want to be generous and actually look at the Weber report, there's nothing there in terms of evidence that could show from which a reasonable jury could conclude that there was even one false claim with respect to an alleged violation of the LCP rule, but there's literally nothing in here that even goes to the right standard. It's a total airball. It's a total miss between the right standard and the evidence. Mr. Weber at page 76 at the top of this section, as I explained to Judge Lee, and then again at page 1, page 5, page 21, page 24, and page 26, over and over, states the rule wrong. When an evidence is completely analyzed under the wrong standard, there's nothing for a reasonable jury to find for them on. This is important. If this were enough, if what Mr. Keith has come forward here with is enough to get to a jury, any False Claims Act plaintiff alleging a violation of the lowest corresponding price rule would merely have to show different prices and get to the jury on hundreds of millions of dollars of liability, but different prices for different schools and libraries as compared to other non-residential customers are explicitly allowed. The FCC said that in paragraphs 488 through 489 of the first report and order. So the orientation is completely wrong. And again, just getting back to your actual question, Judge Hamilton, you can imagine a legal theory and then directing your expert to come up with evidence that matches the legal theory that would at least use the four foundational factors, but he hasn't even done that. And why, Your Honor, if you go back to the opposition to the motion for summary judgment, and much of the briefing in this court, that wasn't even really Realtor's chief goal. He was arguing that the lack of compliance was fraud. It's not unusual for a plaintiff to have an overly ambitious theory and to have a fallback position that is much more sound. And my question, in essence, to you and to your opposing counsel is to focus on that less ambitious but sturdier theory of one-to-one comparisons. Could I ask you a little bit about Center? Sure. In both the super value and Safeway cases, both of those defendants offered interpretations of the relevant regulation that would justify what they did. Now, the explanations came after the fact and from their lawyers, and that's the issue going up to the Supreme Court at this point. But here, I don't understand, particularly given Wisconsin Bell's apparent lack of attention to the issue of lowest corresponding price for several years, what you all thought the relevant standard was that you had to comply with. Prior to 2009, the standard was state and federal non-discrimination laws. And that's all? No undue discrimination. Okay. So nothing specific to the federal regulation? I can't say we had compliance protocols for lowest corresponding price prior to that time. Okay. And afterwards? And afterwards, we had specific extensive protocols on this particular FCC rule, even though, and this does go, I think, to lots of issues in this case, the Universal Service Administrative Corporation, trying not to say USAC, had never even mentioned the lowest corresponding price rule in its application materials until 2010, and never even raised it in its training materials, which is what most companies rely on for compliance, until 2012, and never audited it until 2012. That time period covers the vast bulk of the claims at issue in this case. Which time period? Before or after? Excuse me? Before or after? Which time period are you talking about? Before 2010? I'm saying the claims in this case are from 2002 to 2015. Right. And the USAC never even mentioned this until 2010 at the earliest. I have a very simple question. Your statement was ambiguous. You said that time period was the bulk of the claims. I'm sorry. I mean the time period for the claims at issue in this case. In which? The false. Before or after the 2009 revelations? Well, definitely before 2009. So most of the claims are before 2009 when there were no protocols in place. Is that right? Oh, I don't know because he's never come forward with any evidence of a specific false claim that was submitted. You don't know what your own client's protocols were because the plaintiffs didn't try to prove them. Oh, I'm sorry. I know what the protocols are. I thought Judge Hamilton was asking me which claims align with which. But you all know the case better than I do. But the protocol does break down at 2009. This is not fruitful. Okay. Yes, it's not fruitful. Thank you very much, counsel. I'm sorry. Thank you. Anything further, Mr. Chief Judge? Very quickly, Your Honor. I was remiss in not pointing out and I wanted to make sure it was in the record. We did do a statistical analysis. What Mr. Weber did was analyze every single contract that was produced so that he could figure out which ones resulted in false claims, in false claims for reimbursement. And then his Table 13 is an analysis of just the top 50 largest contracts. And then in the record at 275, we did a statistical analysis to show how that applies to the group of contracts as a whole. Thank you, counsel. Case is taken under advisement.